UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JENNIFER LYNN BENNICK,           :
                                 :CIVIL ACTION NO. 3:16-CV-2391
          Plaintiff,             :
                                 :(JUDGE CONABOY)
          v.                     :
                                 :
NANCY A BERRYHILL,[1]            :
Acting Commissioner of           :
Social Security,                 :
                                 :
          Defendant.             :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the
Commissioner's denial of Disability Insurance Benefits ("DIB")
under Title II of the Social Security Act.  (Doc. 1.)  Plaintiff
filed an application for benefits on May 16, 2013, alleging a
disability onset date of September 20, 2012.  (R. 15.)  After
Plaintiff appealed the initial denial of the claims, a hearing was
held on January 21, 2015, and Administrative Law Judge ("ALJ")
Therese A. Hardiman issued her Decision on April 15, 2015,
concluding that Plaintiff had not been under a disability during

_____

[1]  Nancy A. Berryhill is now the Acting Commissioner of Social
Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure which addresses the substitution of parties when a public
officer is replaced, Nancy A. Berryhill should be substituted for
Acting Commissioner Carolyn W. Colvin as the defendant in this
suit.  Fed. R. Civ. P. 25(d).  No further action needs to be taken
to continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g), which states
that "[a]ny action instituted in accordance with this subsection
shall survive notwithstanding any change in the person occupying
the office of Commissioner of Social Security or any vacancy in
such office."

the relevant time period.  (R. 28.)  Plaintiff requested review of the ALJ's decision which the Appeals Council denied on October 21, 2016.  (R. 1-6.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

Plaintiff filed this action on December 1, 2016.  (Doc. 1.) She asserts in her supporting brief that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ erred in failing to find Plaintiff's post Chiari Malformation, status post suboccipital craniotomy for decompression of Chiari Malformation, thoracic syringohydromyelia, and rheumatoid arthritis severe impairments; and 2) the ALJ erred in formulating Plaintiff's residual functional capacity ("RFC") and determining she was capable of work at step five by misstating Plaintiff's activities, not considering medication side effects, not taking into account testimony regarding pain, and improperly relying on the state-agency physician.  (Doc. 11 at 6.)  After careful review of the record and the parties' filings, the Court concludes this appeal is properly denied.

## I. Background

Plaintiff was born on July 28, 1974, and was thirty-eight years old on the disability onset date.  (R. 26.)  She has a high school education, Associates Degree as a paralegal, and past relevant work as a data entry person, paralegal, and staff sergeant.  (R. 26; Doc. 11 at 2.)

**A.   Medical Evidence**

In view of the extensive record presented in this case, the Court's summary of medical evidence primarily focuses on records relevant to the impairments specifically at issue with Plaintiff's claimed errors and evidence upon which the parties rely.

**1.   <u>Chiari Malformation and Cognitive Impairment</u>**

For many years, Plaintiff treated at Geisinger Medical Center for symptoms related to a number of physical problems including Chiari malformation[2] and arthritis.  (R. 182-828.)  Neurology Consultation Notes dated August 23, 2012, indicate Plaintiff reported that several weeks earlier she had developed head pressure and pain on awakening which wore off in a few hours.  (R. 555.) Several days before her office visit, the headache and pressure did not go away--it increased in intensity and was associated with confusion to the point that she could not do her job in billing for Emergency Medical Services and had enough confusion for a few hours that she could not drive and had a loss of recent memory.  (*Id.*) After this event, the headache continued and Plaintiff felt she had experienced a decrease in her ability to think, concentrate, and

---

[2]   "A Chiari malformation is a structural defect in the cerebellum that occurs when part of the cerebellum sits below the foramen magnum.  Among the resulting complications, it can cause problems with balance and block the flow of cerebrospinal fluid." (Doc. 12 at 4 n.4 (citing Chiari Malformation Fact Sheet, National Institute of Health/National Institute of Neurological Disorders and Stroke, available at: https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Chiari-Malformation-Fact-Sheet.

remember over the preceding four to five weeks. (*Id.*)

At a September 5, 2012, office visit with Shelly D. Timmons, M.D., in Geisinger's Neurosurgery Department, patient history indicated that Plaintiff found it difficult to work because of worsening headaches with associated concentration problems. (R. 593.) Rather than her regular computer and phone duties, she had been put on light-duty filing and doing things around the office. (*Id.*) Dr. Timmons' Impression was that Plaintiff's Chiari malformation was symptomatic, and she recommended surgical decompression. (*Id.*) Plaintiff had the recommended surgery on October 18, 2012, with no complications. (R. 775-79.)

Plaintiff continued to report headaches after her surgery. On November 12, 2012, Plaintiff told Dr. Timmons that her headaches were the same as before the surgery. (R. 468.) In January 2013, Dr. Timmons reminded Plaintiff that she had been told it would take a while to get over surgery. (R. 692.) Dr. Timmons noted that Plaintiff's reported problems were not unexpected--problems which included decreased environmental filtering, sensory overload, an inability to multi-task, decreased concentration, and imbalance. (*Id.*) Plaintiff said her symptoms were worse in the morning and improved after about three hours. (*Id.*) Plaintiff told Dr. Timmons that she could not function to focus on reports, handle office work, and be around eleven people at work as she could "barely do things at home in a quiet environment." (*Id.*)

4

Plaintiff felt she was improving to some degree but had reached a plateau. (*Id.*) Dr. Timmons' Impression was that the symptoms were not unexpected and should continue to improve, adding that they "[m]ay improve and plateau several times." (R. 693.) Dr. Timmons opined that Plaintiff could not yet return to work at Danville EMS but she would anticipate an eventual return. (*Id.*)

In May 2013, Plaintiff reported that her headaches were helped by Advil and her neck stiffness was improving. (R. 752.) Her main complaint was memory loss and difficulty concentrating. (*Id.*) Plaintiff said she had not been able to go back to work because she could not function on the level of her job responsibilities. (*Id.*) The provider recommended referral to NeuroPsych for cognitive evaluation secondary to memory loss and processing. (*Id.*)

On August 30, 2013, Plaintiff saw Randy Fulton, Psy.D., and Bradley Wilson, Ph.D., for a neuropsychological evaluation due to memory concerns and difficulty focusing. (R. 891-94.) They summarized Plaintiff's condition as follows:

> Currently, Mrs. Bennick reported that she has had difficulty with memory and concentration, which began within the past year. She reported that she has had difficulty completing tasks, is easily distracted and unable to remember if she had completed a previously started task (e.g., washing hair in the shower, putting detergent in laundry). She also reported having a visual sense of continuing motion after riding in a car, stating that she must remain still and close her eyes for a brief time before the sensation goes away. She reported difficulties in operating a riding lawnmower,

5

stating that she will often run into rocks
and trees, feeling as though she is not able
to correctly judge the distance between the
mower and the objects. She also reported
that she has a hard time finding her way in
new areas and gave an example of difficulty
maneuvering from one location to another at a
friend's house. She also reported changes in
her ability to track information that she
reads. She used to be an avid reader but
stated that she is no longer able to read due
to "having to read the same material over and
over again."

In regard to physical complaints, Mrs.
Bennick reported that she has occasional
headaches in the occipital area, which she is
typically able to manage with Advil. She
reported that the frequency and intensity of
her headaches have reduced following her SOC
surgery. She acknowledges having some
occasional loss of balance without any
history of falls. She denied any history of
psychiatric illness or treatment.

. . . .

. . . Currently she lives with her mother and
16 year old daughter. . . . Mrs. Bennick
reported that she is able to function in her
current environment, with the use of some
compensatory strategies to complete certain
tasks. She stated that she is uncertain of
her ability to drive and return to work due
to her current symptoms.

(R. 891-92.) The evaluating doctors made the following behavioral

observations:

She was alert, oriented, and understood the
purpose of the evaluation. Gait was normal.
Posture and gross motor activities were
normal. Her attention to grooming and
hygiene was good. Speech was spontaneous and
fluent, with normal prosody and intonation.
Thought processes were clear, coherent, and
goal-directed. Mood was reported as "good."

6

> Affect was congruent with mood and expressed
> in an appropriate range.  She denied having
> past or present suicidal ideation.  Social
> comportment was intact, and she was pleasant
> and cooperative with the examiners.  Her
> approach to testing was persistent and she
> appeared to be motivated to give her best
> effort based upon her focus on test stimuli,
> responsiveness to instruction, and
> psychometric data.  Results of the present
> evaluation are considered to be an accurate
> depiction of her current level of
> neuropsychological status.

(R. 892.)

In the "Summary and Clinical Impressions" section of the report, Dr. Fulton and Dr. Wilson indicated visual-spatial perception presented as intact, and test results showed high average intellectual abilities with commensurate verbal and nonverbal abilities and average to high average reasoning and problem-solving abilities.  (R. 893.)  However, overall performance for primary memory test scores was considered low average and the doctors noted that the discrepancy between this performance level and the general intellectual ability was rare.  (*Id.*)  They opined "[r]egarding etiology, results indicating inefficiencies with memory acquisition are generaly consistent findings among those with cerebellar dysfunction.  The patient's report of distractibility and poor task-completion are also consistent with reports of those with Chiari 1 malformation."  (*Id.*)  The doctors added that Plaintiff "may benefit from the use of compensatory strategies and support from cognitive rehabilitation therapy to try

7

and help with managing encoding of information and task completion." (*Id.*)  They diagnosed "Mild Neurocognitive Disorder Due to another Medical Condition." (R. 894.)  In addition to the recommendations noted above, the doctors offered other suggestions and stated that "recommended accommodations at the time of reentry to the work place would include a gradual return, a location minimizing distractions, opportunity for frequent breaks, and minimizing the number of projects working at one time." (*Id.*)

At a primary care office visit on November 13, 2013, Plaintiff saw Agnes S. H. Sundaresan, M.D., and reported headaches that "felt like she was wearing a tight hat-more like pressure." (R. 916.)  She said she was taking 600 mg. of Advil two to three times a day and wondered if she should take something else. (*Id.*)  Plaintiff also reported cognitive and speech difficulty. (*Id.*)  Physical examination showed that Plaintiff was alert, healthy, and in no distress, and no abnormal findings were noted. (R. 918.)

Between October 2013 and September 2014, Plaintiff received speech, cognitive and occupational therapy at Geisinger Health South Rehabilitation Hospital. (R. 1056-1253, 1279-1405.)  In October 2013, Plaintiff was assessed to have cognitive and memory impairments and good rehabilitation potential. (R. 1061.)  In February 2014, Plaintiff expressed goals of remembering better and returning to work. (R. 1132.)  Progress notes indicate that Plaintiff successfully completed shopping tasks and she was able to

complete math calculations manually and with a calculator but she continued to report difficulties with attention when tasks became more complex and with math during daily calculations. (*Id.*) At the March 18, 2014, Occupational Therapy session, Plaintiff's rehabilitation potential was noted to be fair due to the severity of her impairment. (R. 1115.) However, the summary indicates she successfully completed the cognitive skills development exercises and tests. (R. 1116.)

As of April 2014, Plaintiff reported at her Geisinger Psychiatry office visit that she continued to have head pressure and medications had not helped her thinking or processing of information. (R. 1441.) Plaintiff had just attended speech and occupational therapy and noted that she could not answer questions appropriately after reading a paragraph. (R. 1441.)

In May 2014, Michael Raymond, Ph.D., of Heinz Rehab Hospital conducted an Independent Neuropsychological Evaluation. (R. 1259-73.) His evaluation, which had the specific emphasis of assessing Plaintiff's current level of adaptive functioning, included a review of data--office notes from Dr. Timmons, Dr. Wilson's evaluation, and therapy notes from the initial evaluation in October 2014 up to January 14, 2014, progress notes. (R. 1260.) After reviewing records, and setting out his own observations and results of tests he administered, Dr. Raymond stated: "In summary, the above enumerated findings, with a reasonable degree of

neuropsychological certainty, are essentially unremarkable for noteworthy cognitive limitations 1½ years post surgical decompression for Chiari malformation type 1." (R. 1269.)

At her July 22, 2014, neurosurgery visit to Dr. Timmons' office, PA Kevin Hickman noted that MRI of the brain and thoracic spine for post-surgical follow up were stable in appearance. (R. 1463.) Plaintiff continued to report headaches which were helped by Advil. (*Id.*) Mr. Hickman recorded that Plaintiff's main complaint was memory loss and difficulty concentrating. (*Id.*) He noted that she had been unable to go back to work because she could not function on the level of her job responsibilities. (*Id.*) In the "Plan" portion of the notes, Mr. Hickman stated that Plaintiff was "unable to be gainfully employed at this point." (R. 1464.)

Plaintiff was discharged from therapy on September 3, 2014, because goals had been met. (R. 1401.) Records state "Patient has improved her attention, processing of information, calculations for daily math tasks, and deductive reasoning. She needs some extra time to process information and give all aspects consideration. She carries over recommended therapy tasks to home environment. She has good skills to implement carryover in daily tasks." (R. 1402.)

On October 13, 2014, Plaintiff was seen by Christian S. Greco, D.O., of Geisinger's Internal Medicine Department, to establish care. (R. 1496.) Dr. Greco noted that Plaintiff was "currently

feeling rather well" although she said she often gets confused and "turned around" in conversations, she was unable to read several sentences at a time, was limited in her daily activities, was unable to drive due to disorientation, and unable to work due to lack of ability to focus. (*Id.*) Dr. Greco concluded that the headaches were likely a combination of anatomical malformations, anxiety, and chronic disease. (R. 1497.)

In a note dated October 16, 2014, Rachael S. Truchil, M.D., of the Internal Medicine Department noted that she had performed a history and physical and discussed the case with Dr. Greco. (R. 1496.) She recorded that Plaintiff was taking clonazepam chronically for headaches as that had been the only medication helpful and she wanted to change the medication because of the downsides of chronic use of the medication. (*Id.*) Dr. Truchil thought the headaches sounded like chronic tension headaches which could be treatemd with low-dose nortriptyline. (*Id.*)

On December 2, 2014, Plaintiff again saw Dr. Greco and reported that she had been taking the amitriptyline and was feeling much better with less frequent headaches which were less severe when they occurred. (R. 1529.) She also reported less of a "hazy" feeling. (*Id.*) Dr. Greco observed that Plaintiff was not as symptom focused and was less confused. (R. 1530.)

**2. Rheumatoid Arthritis and Related Impairments**

As noted above, For many years, Plaintiff treated at Geisinger

Medical Center for symptoms related to a number of physical problems including arthritis. (R. 182-828.) Plaintiff specifically cites very little evidence regarding her rheumatoid arthritis and related problems. (Doc. 11 at 3.) She first points to records from Geisinger Orthopaedics Department dated November 21, 2008, which indicate that Plaintiff reported she "has rheumatoid arthritis and has had foot pain for many years. She states that the pain is refractory to conservative care and has been referred by a podiatrist." (R. 251.) The resident and attending physicians recommended left forefoot reconstruction to which Plaintiff consented. (R. 252.) After citing this evidence, Plaintiff notes that "[d]espite the continuing issues involving rheumatoid arthritis, the Claimant continued to work." (Doc. 11 at 3.) She also points to Orthopaedic Surgery Outpatient Notes dated December 31, 2008, indicating Plaintiff had foot reconstruction on December 18, 2008, and had been doing well with no complaints. (R. 260.) In the argument section of her brief, Plaintiff notes that she has undergone surgery for her feet and left wrist, she takes medication for her pain which adds to her cognitive issues, her rheumatoid arthritis causes limitation on the amount of time she can stand and the amount she can lift, and she continued to have treatment for the condition even after the hearing and was scheduled for follow up surgery. (Doc. 11 at 9 (citing R. 25, 26, 68, 69, 1552).)

12

Defendant points to several records which allegedly show that Plaintiff's arthritis pain was controlled with Humira. (Doc. 12 at 6 (citing R. 731, 835, 1423).) At Plaintiff's April 25, 2013, visit to Geisinger Family Practice in Danville, office notes indicate the diagnoses of Rheumatoid Arthritis and Chiari 1 malformation. (R. 731.) Notes state that Plaintiff was doing well in general and she had done well with Humira for rheumatoid arthritis. (*Id.*) February 4, 2014, records from the Rheumatology Department note that Plaintiff's only issue was wrist pain at ulnae styloids bilaterally. (R. 834.) Plaintiff continued to take Humira for rheumatoid arthritis, she reported no medication side effects, and musculoskeletal examination showed normal range of motion with prominent ulnar styloid bilaterally. (R. 835-36.) On April 3, 2014, Plaintiff saw Joel C. Klena, M.D., at Geisinger's Orthopaedics Department complaining of bilateral wrist pain. (R. 1423.) Dr. Klena noted that Plaintiff had rheumatoid arthritis which was under good control with medication. (*Id.*) He noted that he discussed with Plaintiff that the bilateral ulnar instability was from her rheumatoid arthritis and he would start by treating her with injections and a lace up brace bilaterally and eventually she may need an ulnar resection if conservative treatment failed. (R. 1425.)

At her rheumatology appointment with Thomas P. Olenginski, M.D., on October 13, 2014, he noted that surgery for Plaintiff's

left wrist was planned for October 30th. (R. 1510.)

At Plaintiff's December 2, 2014, visit with Dr. Greco, she reported that she had no issues with the October surgery except for mild limitations with the casting. (R. 1529.) Dr. Greco indicated that she would have surgery on her other wrist at some time. (*Id.*) He also noted that other aspects of her rheumatoid arthritis were minimal at the time and she was continuing with Humira treatment successfully. (*Id.*)

## B. *Opinion Evidence*

On June 19, 2013, Kurt Maas, M.D., a State Agency medical consultant, concluded that Plaintiff had the severe impairments of "Other Disorders of the Nervous System" and "Inflammatory Arthritis." (R. 81.) He completed a Residual Functional Capacity assessment and determined that Plaintiff had the following exertional limitations: she could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; she could stand and/or walk for six hours in an eight-hour workday; and she could sit for six hours in an eight-hour workday. (R. 82.) He also found that Plaintiff had the following postural limitations: she could occasionally climb ramps/stairs, balance, stoop, kneel, and crouch; and she could never climb ladders/ropes/scaffolds and never crawl. (*Id.*) Regarding environmental limitations, Dr. Maas noted that Plaintiff had to avoid extreme cold and avoid concentrated exposure to vibrations, fumes, odors, dusts, gases,

poor ventialation, etc., and hazards. (R. 83.) Dr. Maas opined that Plaintiff was capable of light work. (R. 84.)

## C. *Function Report and Hearing Testimony*

Plaintiff completed the Function Report on May 29, 2013, stating that her ability to work was limited in that she was unable to have a manual labor job because of her rheumatoid arthritis and the Chiari malformation left her unable to do an office/mental job because her short term memory was very bad and her long term memory was "hit or miss." (R. 143.) Plaintiff said she took care of herself and her teenage daughter, she did some meal preparation, she was able to do some house and yard work, and she did not drive or go shopping in stores by herself but she did some shopping by computer. (R. 144-46.) Plaintiff noted that she needed to post reminders to herself and devise strategies to complete tasks. (R. 145.) Plaintiff said the following activities were affected by her conditions: bending, reaching, seeing, memory, completing tasks, concentration, understanding, and following instructions. (R. 148.) She added that bending and reaching increased pressure in her head, and the remaining activities indicated were affected due to confusion, long-term memory, disorientation, and vision issues even while sitting. (*Id.*) Plaintiff said she could follow simple written instructions if she re-read them and she did not follow spoken instructions well because of retention and recall problems. (*Id.*) Plaintiff said she had no problem getting along with

15

authority figures, she handled stress "pretty good," and handled changes in routine well. (R. 149.) In the "Remarks" section of the report, Plaintiff commented that the Chiari Malformation "turned my whole world upside down" and the "loss/lack of short term memory effects [sic] every second of my life." (R. 150.)

In a Supplemental Function Questionnaire concerning fatigue, Plaintiff said she started to have fatigue when she was diagnosed with rheumatoid arthritis in 2004. (R. 151.) She added that some days were worse than others and on bad days she just tried to rest. (*Id.*) Plaintiff said the Humira she took for arthritis did not have any effect on her fatigue. (*Id.*)

In a Supplemental Function Questionnaire concerning pain, Plaintiff said her pain began in August 2012 when she went to the emergency room and it was related to the Chiari malformation. (R. 152.) She described the pain as extreme head pressure, with pain down the back of her neck to the upper back and it hurt to blink her eyes. (*Id.*) Plaintiff said the pain was less severe than at the onset but she had it daily and certain activities caused pain such as stretching, bending, and lifting things. (*Id.*) She also said she was more stiff in the morning and more sore in the evening. (*Id.*)

At the January 21, 2015, hearing before ALJ Hardiman, Plaintiff related background and daily activities similar to those outlined in her Function Report. (*See* R. 56-61.) Plaintiff stated

that she could stand for about thirty minutes before she would have to sit and she could sit for about an hour before she would have to stand. (R. 62.) She said she could walk a few miles. (*Id.*)

Plaintiff reviewed her medications: she took Humira for arthritis which worked well and she took Meloxicam occasionally between Humira injections and that was also effective; she said the Oxycodone and Norco were effective; the muscle relaxant Flexeril which she took at night was effective as was the Critrulline. (R. 62-63.) Plaintiff said that her medications did not cause any side effects. (R. 64.) Upon later questioning by her attorney, Plaintiff clarified that her medications did not completely relieve her symptoms and she had side effects like fatigue from some medications so she just took them at night, and narcotic arthritis medication acted "like an impairment on [her] brain." (R. 69.)

Plaintiff testified that she was no longer going for cognitive therapy but she did daily exercises at home and continued to see an occupational therapist every two weeks for her wrist. (R. 62, 64.)

When asked about symptom aggravation, Plaintiff said arthritis symptoms became worse if she did a lot of work or lifted ten pounds. (R. 64-65.) She said the Chiari-related symptoms became worse if she did a lot of thinking or tried to do new things. (R. 65.)

Plaintiff's attorney asked about difficulties with reading, writing, and math calculations and Plaintiff explained her

limitations in those areas: although she was capable of reading, she had difficulty stringing thoughts together to talk about what she read; and it was difficult and took a while for her to get her thoughts down when writing.  (R. 65-66.)

ALJ Hardiman asked the VE to consider an individual of the same age, education, and work experience as Plaintiff who had the

> capacity to perform light work.  However, that light work is limited.  There should be no more than occasional bilateral upper extremity pushing or pulling; occasional climbing, balancing, stooping, kneeling, crouching and crawling, but never on ladders.
>
> There should be no bilateral overhead reaching.  There would be a need to avoid temperature extremes, humidity, vibration, fumes and hazards.  The individual would be limited to simple/routine tasks.  Low stress is defined as only occasional decision-making required and only occasional changes in the work setting.

(R. 73.)  Vocational Expert Paul A. Datti ("VE") testified that such an individual could not do Plaintiff's past relevant work which included work as a data entry person and paralegal.  (*Id.*) The VE further testified that such an individual would be able to perform other jobs in the national economy including bakery worker of conveyor line products, school bus monitor, or usher.  (R. 74.)

The ALJ then asked the VE to consider the first hypothetical individual adjusted as follows: lifting and carrying reduced to ten pounds occasionally and less than ten pounds frequently; and sitting, standing and walking could be performed six hours in an

eight-hour workday. (R. 74.) The VE responded that all identified

exemplary jobs would remain available for such an individual.

(*Id.*) However, if the ALJ added that the individual would require

breaks in excess of the normal and/or unscheduled breaks, and/or be

absent more than three times per month, and/or be expected to be

off task more than twenty percent of the day, Mr. Datti responded

that no work would be available. (R. 75.)

**D.    *ALJ Decision***

In her March 11, 2015, Decision, ALJ Hardiman made the

following Findings of Fact and Conclusions of Law:

> 1.    The claimant meets the insured status
>       requirements of the Social Security Act
>       through December 31, 2017.
>
> 2.    The claimant has not engaged in
>       substantial gainful activity since
>       September 20, 2012, the alleged onset
>       date (20 CFR 404.1571 et seq.).
>
> 3.    The claimant has the following severe
>       impairments: tension headaches;
>       bilateral ulnar wrist instability;
>       bilateral epicondylitis; right
>       radiocarpal arthritis; status post left
>       ulnar resection/autograft; distal/radial
>       ulnar joint arthrosis with bilateral
>       lateral epicondylitis and right
>       radiocarpal arthritis injections and
>       cognitive impairment (20 CFR
>       404.1520(c)).
>
> 4.    The claimant does not have an impairment
>       or combination of impairments that meets
>       or medically equals the severity of one
>       of the listed impairments in 20 CFR Part
>       404, Subpart P, Appendix 1 (20 CFR
>       404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). The claimant could occasionally use bilateral upper extremity for pushing and pulling. The claimant could occasionally climb, balance, stoop, kneel, crouch and crawl, but never on ladders. The claimant must avoid temperature extremes, humidity, vibration, fumes, and hazards. The claimant is limited to simple routine tasks and low stress as defined as only occasional decision making and only occasional changes in the work setting.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on July 28, 1974 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

> 11. The claimant has not been under a
>     disability, as defined in the Social
>     Security Act, from September 20, 2012,
>     through the date of this decision (20
>     CFR 404.1520(g)).

(R. 17-28.)  Other relevant portions of the ALJ's Decision will be referenced in the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can

---

[3] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

21

perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 27.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is

22

limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence–– particularly certain types of evidence (e.g., that offered by treating physicians)––or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his

23

decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .."). "However,

24

even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ erred in failing to find Plaintiff's post Chiari Malformation, status post suboccipital craniotomy for decompression of Chiari Malformation, thoracic syringohydromyelia, and rheumatoid arthritis severe impairments; and 2) the ALJ erred in formulating Plaintiff's residual functional capacity ("RFC") and determining she was capable of work at step five by misstating Plaintiff's activities, not considering medication side effects, not taking into account testimony regarding pain, and improperly relying on th state-agency physician. (Doc. 11 at 6.)

### A. Step Two Error

Plaintiff asserts the ALJ erred by failing to recognize the

Chiari malformation and rheumatoid arthritis as severe impairments despite evidence that the conditions were severe and the error affected the formulation of the residual functional capacity ("RFC"). (Doc. 11 at 6-7.) Defendant responds that the argument is without merit for several reasons, including that the impairments that were deemed severe are closely related to the impairments the ALJ deemed to be non-severe. (Doc. 12 at 11-12.) The Court concludes that Plaintiff has not shown that the claimed step two errors are cause for reversal or remand.

The Court does not find error regarding the Chiari malformation for the reasons discussed by Defendant: Plaintiff did not show that the Chiari malformation itself met the twelve-month durational requirement and the ALJ based her determination on a May 2013 MRI which noted a stable syrinx and satisfactory appearance of the foramen magnum following the surgery as well as Plaintiff's follow-up exam with the neurosurgeon who reported normal objective physical examination findings post surgery; and the ALJ found the residuals of headaches and cognitive issues related to the Chiari malformation to be severe impairments. (Doc. 12 at 14, 16 (citing R. 18).) Further, because an error may be deemed harmless where the ALJ considered the established functional limitations when the inquiry proceeded beyond step two, *Rutherford*, 399 F.3d at 553, and because Plaintiff does not point to any functional limitations related to the Chiari malformation other than the headaches and

cognitive issues recognized, any error related to the Chiari malformation itself or the October 2012 surgery would be harmless.

Plaintiff's claimed error regarding rheumatoid arthritis (RA) would similarly be deemed harmless because she does not point to any functional limitations which were not considered by the ALJ. The ALJ specifically considered RA-related problems to be severe: bilateral ulnar wrist instability, bilateral epicondylitis, right radiocarpal arthritis, status post ulnar resection/autograft, distal/radial ulnar joint arthrosis with bilateral epicondylitis and right radiocarpal arthritis injections.[4] (R. 17.) The only general RA limitations noted in Plaintiff's brief allegedly result from medication for chronic pain which adds to her cognitive issues and limitations on the amount of time she can stand and the amount she can lift. (Doc. 11 at 9-10.) As noted above, the ALJ found Plaintiff's cognitive issues severe and Plaintiff does not show that the medication related issues are different in kind from those considered by the ALJ. The ALJ's consideration of standing and lifting limitations is evident in her RFC assessment that Plaintiff was capable of a limited range of light work.[5]

---

[4] The link between specific issues and RA is documented in the medical records. (*See*, *e.g.*, R. 1425.)

[5] 20 C.F.R. § 404.1567 provides the following definition of light work:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very

Because Plaintiff has not shown that any alleged step two error would be harmful, she has not shown that remand is required for reconsideration of the categorization of Plaintiff's Chiari malformation and rheumatoid arthritis. *See Rutherford*, 399 F.3d at 553.

## B. *Residual Functional Capacity and Step Five Error*

Plaintiff asserts that the ALJ "committed numerous errors in formulating the RFC . . . and determining she was capable of work at Step Five of the Sequential Analysis." (Doc. 11 at 10.) Plaintiff identifies the following specific errors: misstatement of Plaintiff's capabilities; improper consideration of medication side-effects; improper consideration of subjective complaints of

---

little, a job is in this category when it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of times.

20 C.F.R. § 404.1567(b). Social Security Ruling 83-10, 1983 WL 31251 (S.S.A.), provides additional guidance and definitions for terms used in the regulations cited:"frequent" in the light work context means from one-third to two-thirds of the time; "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an 8-hour workday." *Id.* at *5-6.

pain; and improper reliance on the State Agency consultant. (*Id.* at 10-16.) Defendant responds that the RFC assessment is supported by substantial evidence and the ALJ properly relied on Dr. Maas's opinion. (Doc. 12 at 17-26.) The Court concludes that Plaintiff has not shown error on the bases alleged.

## 1. **Plaintiff's Capabilities**

Plaintiff first argues the ALJ misstated her capabilities in formulating her RFC. (Doc. 11 at 10.) She begins this argument by quoting/citing ALJ Hardiman's findings at step three regarding whether Plaintiff's mental impairment met or equaled the criteria of listing 12.02. (*See* R. 19-20.) This is a separate inquiry from the RFC which is used at steps four and five. ALJ Hardiman specifically stated that the limitations considered "are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." (R. 21.) Plaintiff does not claim error at step three and her reliance on findings made at that stage of the evaluation process do not support her claimed RFC error.

Plaintiff also provides a table comparing the "ALJ's Findings" and "Contrary Evidence." (Doc. 11 at 11.) A comparison of the ALJ findings made in the course of her RFC assessment (step three findings excluded (*see id.* at 11 (citing R. 20)) and "Contrary Evidence" shows that the "contrary" evidence is better characterized as evidence providing detail and background relevant

29

to the ALJ's finding.  For example, the ALJ's finding that
Plaintiff "performs her own self-care and does chores" is not
inaccurate because she relies on compensatory strategies to
accomplish some aspects of care and chores--the latter explain *how*
she performs the former.  Importantly, Plaintiff does not show that
any of the findings made in the course of the RFC assessment are
completely incorrect.[6]

Following the table, Plaintiff makes the conclusory statement
that "[a] proper review of the evidence would have lead to a
conclusion the Claimant was incapable of any substantial gainful
activity."  (Doc. 11 at 12.)  Plaintiff cites no opinion or
evidence which supports this conclusion and does not attempt to
show how the "contrary evidence" establishes that she is unable to
perform a limited range of light work with restrictions including a
limitation "to simple routine tasks and low stress" (R. 21).
Further, Plaintiff's conclusion that a proper review of the
evidence would have shown that she was incapable of *any* substantial
gainful activity does not take into account the August 30, 2014,
diagnosis of Dr. Fulton and Dr. Wilson that Plaintiff had "*Mild*
Neurocognitive Disorder Due to another Medical Condition" (Doc. 10-
3 at 35 (emphasis added)).  Plaintiff does not reference the fact
that the doctors' recommendations included work reentry strategies.

---

[6]  ALJ Hardiman's review of the record in many instances
provides the detail which Plaintiff cites as contrary.  (*See* R. 22-
26.)

(*See* R. 894.)  Plaintiff also fails to acknowledge that records show that she experienced improvement with cognitive rehabilitation which began in October 2013 (R. 1061) and continued into September 2014 when she was discharged (to continue a home program) with therapy goals met.  (R. 1401-02.)  Though not relied upon by the ALJ, the complete review of the record evidence suggested by Plaintiff (Doc. 11 at 12) would include Dr. Raymond's May 2014 evaluation in which he stated that the "current evaluation does not suggest or support 'mild cognitive impairment'" (R. 1268) and that his findings were "essentially unremarkable for noteworthy cognitive limitations at 1½ years post surgical decompression" (R. 1269).  This contextual review of Plaintiff's claimed error regarding the ALJ's statements about Plaintiff's capabilities shows that Plaintiff has not met her burden of showing error requiring reversal or remand.

## 2.  **Medication Side Effects**

Plaintiff contends the ALJ did not properly consider the side effects of her medication.  (Doc. 11 at 12.)  Defendant responds that there is scant support in the record for debilitating side effects.  (Doc. 12 at 22.)  The Court concludes Plaintiff has not shown that reversal or remand are warranted on the basis of the ALJ's consideration of the effects of medication.

In her very brief analysis of this issue, Plaintiff cites a Ninth Circuit case in support of the propositions that the effects

of medication can have a significant impact on the ability to work, side effects should be considered in the disability determination process, and a claimant' subjective testimony about side effects "should not be trivialized." (Doc. 11 at 12 (citing *Varney v. Sec'y of HHS*, 846 F.2d 581, 585 (9th Cir. 1988)).) Plaintiff cites *Stewart v. Sec'y of Health, Educ., & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983)), in support of the assertion that an ALJ must specifically explain why she rejected testimony concerning medication side effects. (Doc. 11 at 12.) Plaintiff then summarily concludes that the ALJ failed to properly consider medication side effects and the matter must be remanded for proper consideration of the issue. (Doc. 11 at 12-13.)

Plaintiff's conclusory assertion does not satisfy her burden of showing error on the basis alleged. Accepting the legal framework identified by Plaintiff, Plaintiff does not show how the ALJ ran afoul of the relevant guidance. Plaintiff does not acknowledge that ALJ Hardiman provided reasons for her determination: the ALJ noted Plaintiff's testimony that her medications do not cause side effects and her later testimony that they made her tired and caused cognitive issues; the ALJ then proceeded to contrast the latter testimony with medical records stating that they "do not support that she has reported any significant side effects from her medications or sought changes to them based on side effects." (R. 26.) Importantly, Plaintiff does

32

not refute the ALJ's assessment of the medical records on this issue. (*See* Doc. 11 at 12-13.) Therefore, Plaintiff has not shown that ALJ Hardiman's consideration of the effects of Plaintiff's medication is cause for remand.

**3.   Subjective Complaints of Pain**

Plaintiff next maintains that the ALJ did not properly consider Plaintiff's complaints of pain. (Doc. 11 at 13.) Defendant responds that the ALJ's decision not to fully credit Plaintiff's complaints of pain is supported by the record. (Doc. 12 at 23.) The Court concludes Plaintiff has not met her burden of showing error in the ALJ's pain assessment.

Plaintiff lists her medical conditions and provides one citation to the Operative Report of her October 2012 surgery. (Doc. 11 at 13-14 (citng R. 777).) Without citation to the record, Plaintiff states that she routinely complained of headaches and related symptoms and has undergone surgery to address arthritic conditions. (*Id.* at 14.) Importantly, the ALJ did not find Plaintiff symptom-free: she noted Plaintiff's testimony about the effectiveness of pain medications (R. 23, 25) and acknowledged her previous and future surgeries related to arthritis (R. 24-25, 26). As many decisions in the Third Circuit have noted, a claimant "need not be pain-free to be found 'not disabled' especially when her work issue requires a lower exertional level." *Morel v. Colvin*, Civ. A. No. 14-2934, 2016 WL 1270758, at *6 (D.N.J. Apr. 1, 2016)

(citing *Lapinski v. Colvin*, Civ. A. No. 12-02324, 2014 WL 4793938, at *19 (M.D. Pa. Sept. 24, 2014)); *Pettway v. Colvin*, Civ. A. No. 14-6334, 2016 WL 5939159, at *19 (E.D. Pa. Apr. 8, 2016); *see also Welch v. Heckler*, 808 F.2d 264, 279 (3d Cir. 1986) (facts which supported the conclusion that pain may be constant and uncomfortable did not support the conclusion that it was disabling and severe).

Although the Court agrees with Plaintiff that subjective complaints of pain must be seriously considered (Doc. 11 at 13 (citing *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985))), and should not be discounted without contrary medical evidence (*id.* (citing *Green v. Schweiker*, 749 F.2d 1066, 1070 (3d Cir. 1984); *Smith*, 637 F.2d at 972, *Ferguson*, 765 F.2d at 37)), here Plaintiff has not shown that the ALJ did not seriously consider her complaints of pain. To the extent Plaintiff infers that she complained of disabling pain, she has not presented *evidence* which contradicts ALJ Hardiman's finding that Plaintiff's pain was not disabling. Thus, Plaintiff has not met her burden of showing error on the basis alleged.

## 4. State Agency Opinion

Plaintiff argues that ALJ Hardiman improperly relied on the opinion of the State Agency medical consultant, Dr. Maas. (Doc. 11 at 14.) Defendant responds that the ALJ properly relied on this

34

opinion. (Doc. 12 at 24.) The Court concludes Plaintiff has not shown that this alleged error is cause for reversal or remand.

As noted by the ALJ, the record does not contain any medical opinions from Plaintiff's treating physician or other evaluating sources. (R. 25.) Although Plaintiff correctly states that Dr. Maas did not have her complete medical file and she had significant medical treatment after he rendered his opinion in June 2013 (Doc. 11 at 14), she does not acknowledge that the ALJ recognized Dr. Maas's limited review and she concluded that the later evidence supported additional limitations "including push/pull, reach and mental limitations which have been afforded to address claimant's non-severe and severe impairments and her subjective complaints." (R. 25.) Because the ALJ did not simply rely on Dr. Maas's opinion in formulating the RFC, Plaintiff must do more than assert the blanket criticism set out in her brief.

Plaintiff's additional assertion that the ALJ committed reversible error by failing to address the medical opinions of Dr. Wilson, Dr. Fulton, and Dr. Timmons (Doc. 11 at 15) does not present cause for reversal or remand. First, Plaintiff presents absolutely no supporting argument with this statement. Importantly, to the extent that the evaluation from Dr. Fulton and Dr. Wilson is considered an opinion, their report did not opine that Plaintiff had deficits which rendered her unable to engage in substantial gainful activity and they did not make findings

inconsistent with performing a limited range of light work which included the limitation to simple routine tasks and low stress. (*See* R. 21, 891-94.) They diagnosed "Mild Neurocognitive Disorder Due to another Medical Condition"--a diagnosis which does not *ipso facto* render an individual disabled for Social Security purposes. (R. 894.) Their recommendations included strategies which could be used "at the time of any reentry to the work place" (R. 894) but provided no information as to when they thought that would or could be.

Although discussion of an alleged opinion from Dr. Timmons is not warranted in that Plaintiff does not provide a citation to any record evidence (*see* Doc. 11 at 15), the Court notes that in January 2013 Plaintiff told Dr. Timmons that she could not function to focus on reports, handle office work, and be around eleven people at work as she could "barely do things at home in a quiet environment" (R. 692), and Dr. Timmons opined that Plaintiff could not yet return to work at Danville EMS but she would anticipate an eventual return (R. 693). This opinion does not point to error in ALJ Hardiman's RFC--at most, Dr. Timmons opined that Plaintiff could not perform her past relevant work in January 2013 and ALJ Hardiman concluded that Plaintiff remained unable to perform her past relevant work as of April 2015 (R. 26).[7]

---

[7] In July 2014, Dr. Timmons' PA, Kevin Hickman, noted that Plaintiff had been unable to go back to work because she could not function on the level of her job responsibilities. (R. 1463.) In

As Plaintiff has not shown the ALJ erred in relying on the State Agency consulting physician, the alleged error is not cause for reversal or remand.

## V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal of the Acting Commissioner's decision is properly denied. An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: July 11, 2017

---

the "Plan" portion of the notes, Mr. Hickman stated that Plaintiff was "unable to be gainfully employed at this point." (R. 1464.)

This evidence does nothing to support Plaintiff's claimed error because it is not an opinion rendered by Dr. Timmons and the only information in the office notes associated with employment which could be considered supportive of Mr. Hickman's statement regarding Plaintiff's inability to be gainfully employed is Plaintiff's report that she could not function on the level of her *former* job responsibilities. (R. 1463.) ALJ Hardiman did not find that Plaintiff could return to that job and limited her to a job with a lower level of responsibility. (R. 21-26.) Therefore, even a generous interpretation of Mr. Hickman's comments would not support Plaintiff's claimed error.